IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PASSPORT HEALTH, INC., a Maryland corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>TRAVEL MED, INC., a California corporation and GINA FLAHARTY, an individual and citizen of the State of California<br><br>        Defendants.* | 2:09-cv-01753-GEB-JFM<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

        This decision decides the bench trial held on April 20, 2011, solely on the damages portion of Plaintiff Passport Health, Inc.'s ("Passport Health") claims. Before the bench trial, Passport Health moved for and was granted partial summary judgment on the liability portion of its following claims: breach of the Franchise Agreement, breach of the Guaranty, and Trademark Infringement alleged under 15 U.S.C. § 1114(1)(a).

///

---

    * The caption is amended since Defendants' counterclaims were dismissed. (ECF Nos. 69, 73.)

# I. FINDINGS OF FACT

## A. BACKGROUND

1. The February 10, 2011 Order granting Passport Health partial summary judgment contains the following uncontroverted facts:

> Plaintiff owns the trademark "PASSPORT HEALTH" and has registered this "trademark with the U.S. Patent and Trademark Office for travel-and health-care-related services[.]" (Plaintiff's Statement of Undisputed Facts ("SUF") ¶ 2.)
>
> A. Franchise Agreement
>
> Passport Health and Travel Med entered into a Franchise Agreement in August 2007. Id. ¶ 3. Under the Franchise Agreement, Passport Health granted Travel Med the right, and Travel Med assumed the obligation, to operate a Passport Health franchise in a designated area for ten years. Id. The Franchise Agreement's ten year term commenced in September 2007, upon the opening of Travel Med's franchise. Id. Travel Med made its last royalty payment to Passport Health in March 2009. Id. ¶ 11. "After Travel Med breached the Franchise Agreement by failing to make royalty payments to Passport Health, Travel Med unilaterally terminated the Franchise Agreement effective June 12, 2009." Id. ¶ 13. Passport Health "fully performed its obligations under the Franchise Agreement." Id. ¶ 17.
>
> In exchange for the right to own and operate a Passport Health franchise and use the Passport Health trademark, Travel Med promised to pay royalties to Plaintiff for the ten year term of the Franchise Agreement. Id. ¶ 4. The Franchise Agreement does not provide Travel Med a right of early termination. Id. Travel Med agreed in the Franchise Agreement that Plaintiff owns the Passport Health trademark. Id. ¶ 5. The Franchise Agreement includes provisions concerning Travel Med's post-termination obligations; specifically, upon termination of the Franchise Agreement, Travel Med was required to stop representing to the public that it is or was affiliated with Plaintiff and to stop using the Passport Health trademark. Id. ¶ 6.
>
> B. Guaranty
>
> When Travel Med executed the Franchise Agreement, Flaharty personally executed a Guaranty, guaranteeing that in the event Travel Med defaulted

2

> on its obligations, Flaharty would personally perform Travel Med's obligations under the Franchise Agreement. (SUF ¶ 7.) Flaharty has not performed Travel Med's obligations under the Franchise Agreement. Id. ¶ 18.

### C. Website

In September 2007, Defendants created a website for Travel Med at "www.passporthealthnca.com". (SUF ¶ 8.) "When Travel Med agreed to become a Passport Health Franchise, Travel Med was not provided with a URL to register by Passport Health. Instead, Travel Med was instructed to find something that was close to 'Passport Health' to register and to use as Travel Med's own website." (Separate Statement in Supp. of Defs.' Opposition ("SSS") ¶ 12.) "Pursuant to that instruction, Travel Med registered www.passporthealthnca.com as its own website on August 12 2007 and pre-paid for the registration for 4 years, ending in September 2011." Id.

"Even though Travel Med stopped making royalty payments to Passport Health in March 2009, Defendants admit that they used the PASSPORT HEALTH Trademarks through at least June 12, 2009." (SUF ¶ 12; SSS ¶ 15.) "[I]n preparation of ceasing to use Passport Health's name[,]" Defendants created a website for Travel Med at "www.travelmedinc.com". (SUF ¶ 9; SSS ¶ 12.) "Until at least July 20, 2010, Defendants' www.passporthealthnca.com website automatically redirected visitors to Defendants' www.travelmedinc.com website." (SUF ¶ 15.)

> After Passport Health's attorneys expressed concern regarding Travel Med's URL www.passporthealth.com in the summer of 2010, Travel Med added the statement: "Due to ongoing litigation with Passport Health, the owner of this URL and website, Travel Med Inc., is unable to redirect you at this time. We regret any inconvenience this may cause you.["] Both "Passport Health" and "Travel Med. Inc." are hyper links that take any visitor to the respective websites of Passport Health and Travel Med.
>
> (SSS ¶ 13.)

2. Flaharty testified at trial that the only reason she terminated the Franchise Agreement was because of an event in the spring of 2009, which caused her to believe the CEO of Passport Health acted

3

unethically when changing Travel Med's pharmaceutical account without Travel Med's approval. Flaharty also testified that this issue was ultimately rectified and Travel Med did not lose any money as a result of the matter.

### B. GROSS REVENUES OF TRAVEL MED

3. Under the Franchise Agreement, Travel Med agreed to pay Passport Health monthly royalties in the amount of seven percent of Travel Med's gross revenues for the ten year term of the agreement. The ten year term would have concluded in August 2017. (Ex. 12.)

4. Travel Med's gross revenues from January 2008 through January 2011 are as follows:

| MONTH | GROSS REVENUES | MONTH | GROSS REVENUES |
|---|---|---|---|
| September 2007 | $ 5,865.80 | June 2009 | $ 61,292.35 |
| October 2007 | $ 37,366.32 | July 2009 | $ 53,755.67 |
| November 2007 | $ 41,350.14 | August 2009 | $ 43,776.16 |
| December 2007 | $ 19,014.89 | September 2009 | $ 54,934.75 |
| January 2008 | $ 40,010.77 | October 2009 | $ 86,878.56 |
| February 2008 | $ 41,687.68 | November 2009 | $ 62,102.45 |
| March 2008 | $ 36,447.30 | December 2009 | $ 35,067.81 |
| April 2008 | $ 52,431.85 | January 2010 | $ 84,752.77 |
| May 2008 | $ 46,363.00 | February 2010 | $ 45,592.63 |
| June 2008 | $ 44,347.05 | March 2010 | $ 58,607.89 |
| July 2008 | $ 34,901.80 | April 2010 | $ 42,862.63 |
| August 2008 | $ 34,857.80 | May 2010 | $ 66,655.03 |
| September 2008 | $ 22,327.41 | June 2010 | $ 57,560.05 |
| October 2008 | $ 44,540.50 | July 2010 | $ 48,043.41 |
| November 2008 | $ 49,917.26 | August 2010 | $ 38,475.47 |
| December 2008 | $ 33,901.97 | September 2010 | $ 54,823.92 |
| January 2009 | $ 34,943.24 | October 2010 | $ 100,813.67 |
| February 2009 | $ 27,279.30 | November 2010 | $ 44,663.82 |

| March 2009 | $ 55,639.35 | December 2010 | $ 44,590.88 |
| April 2009 | $ 56,845.98 | January 2011 | $ 49,477.14 |
| May 2009 | $ 50,797.35 | | |

(Exs. 1-5.)

5. Travel Med did not produce records of its gross revenues for February and March 2011, even though Plaintiff requested the production of this information, and Flaharty testified she did not know and could not testify regarding the gross revenue for those months.

6. Flaharty also testified at trial that Travel Med's future business cannot be determined by its past gross revenue since many factors can impact the travel medicine business involved in this case, including the economic climate, the public's desire for immunizations in a given year, and world events which could reduce travel.

### C. MITIGATION

7. Passport Health found a replacement franchisee for the territory covered by its Franchise Agreement with Travel Med (the "Sacramento area franchise"). Passport Health sold the Sacramento area franchise to Dr. Rajwani for a reduced franchise fee of $12,000. Dr. Rajwani opened his Passport Health clinic in Sacramento in December of 2010. In the four months since opening his clinic, Dr. Rajwani paid $2,712.94 in royalties.

8. Frances Lessans, the CEO and President of Passport Health, testified that prior to Travel Med's termination of the Franchise Agreement, Passport Health had received inquiries from individuals interested in opening a franchise in the Sacramento area. Ms. Lessans testified that she filed that contact information and when Travel Med terminated its Franchise Agreement, she had someone contact those individuals to see if any were interested in purchasing the Sacramento

area franchise. However, no one was interested. She also testified Passport Health had difficulty selling the Sacramento area franchise given the competition from Travel Med and its previous connection to Passport Health. Passport Health subsequently reduced the franchise fee from $35,000 to $12,000 for the purpose of getting Dr. Rajwani Dr. Rajwani to purchase the Sacramento area franchise.

9. Martin Lessans testified regarding the efforts made to find a replacement franchisee; he testified that he called everyone who had previously expressed an interest in a franchise in the area, he then sent out a mailing to advertise, but both mediums used were unfruitful. He also testified that late in 2009 he called Dr. Rajwani, who owns a franchise in the San Francisco Bay Area, to see if he might be interested. Mr. Lessans testified that Dr. Rajwani signed a Franchise Agreement for the Sacramento area franchise in 2010 but it took time for Dr. Rajwani to open his office in Sacramento.

### D. TRADEMARK INFRINGEMENT

10. Flaharty testified that Travel Med did not get any business from July 2009 through July 2010 from the automatic redirect of the "www.passporthealthnca.com" website to the "www.travelmedinc.com" website. She also testified that once the hyperlinks were added in July 2010, she was able to see how much traffic was redirected to the "www.travelmedinc.com" website and she thought there were only eight instances where someone was redirected via the hyperlink to the "www.travelmedinc.com" website.

11. Flaharty also testified at trial that the "www.passporthealthnca.com" website continued to hyperlink to the "www.travelmedinc.com" website until the Court's Order was filed on

February 10, 2011 in which Travel Med was enjoined from using the Passport Health trademark.

12. Ms. Lessans testified that after the Franchise Agreement was terminated, Flaharty continued sending emails which identified Flaharty as a Passport Health franchisee in the signature line.

13. Flaharty testified she was attempting to disassociate Travel Med from Passport Health. Flaharty also testified that she had to make multiple requests to get Travel Med's information changed on the internet search engines and she was eventually successful.

14. Travel Med and Flaharty did not return Passport Health's manuals and supplies when the Franchise Agreement was terminated, as required by the Franchise Agreement. Flaharty testified that she sold the supplies to other Passport Health franchisees.

## II. DISCUSSION

### A. BREACH OF THE FRANCHISE AGREEMENT AND THE GUARANTY

#### 1. Past-Due Royalties

Travel Med failed to pay royalties in April and May, 2009, prior to Travel Med's termination of the Franchise Agreement on June 12, 2009. Therefore, Travel Med, and Flaharty as guarantor, owe seven percent of Travel Med's gross revenues for these months, $3,979.22 for April 2009 and $3,555.81 for May 2009, totaling $7,535.03 in past-due royalties.

#### 2. Royalties Since Breach

Travel Med, and Flaherty as guarantor, also owe royalties on Travel Med's gross revenues since the breach in June 2009. However, the evidence presented only concerned Travel Med's gross revenues from June 2009 through January 2011, during which period Defendants owe Passport Health $79,430.89 in royalties.

///

///

### 3. Future Royalties

Passport Health also presented evidence of Travel Med's past volume of business on the proposition of Travel Med's probable future sales and the future royalties that Defendants owe Passport Health based on such sales. Defendants argue this evidence is entirely speculative since there are many variables that could impact Travel Med's business in the future. However, "[s]ince defendant[s' breach of the Franchise Agreement] made it impossible for plaintiff to realize any profits, it cannot complain if the probable profits are of necessity estimated." Natural Soda Products Co. v. City of Los Angeles, 23 Cal. 2d 193, 200 (1943).

"It is well-established under California law that while the fact of damages must be clearly shown, the amount need not be proved with the same degree of certainty, so long as the court makes a reasonable approximation." Robi v. Five Platters, Inc., 918 F.2d 1439, 1443 (9th Cir. 1990).

> Lost profits to an established business may be recovered if their extent and occurrence can be ascertained with reasonable certainty; once their existence has been so established, recovery will not be denied because the amount cannot be shown with mathematical precision. The extent of such damages may be measured by the past volume of business and other provable data relevant to the probable future sales.

Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc., 78 Cal. App. 4th 847, 889-90 (2000) (internal citation and quotation marks omitted).

Passport Health's evidence shows Travel Med's gross revenues from September 2007 through January 2011. This evidence is sufficient

1  for ascertainment of a reasonable approximation of Travel Med's gross
2  revenues, and the seven percent of that amount which Travel Med would
3  have paid to Passport Health if Travel Med had not breached the
4  Franchise Agreement. Travel Med's average monthly gross revenues from
5  September 2007 through January 2011 was $47,452.78; seven percent of
6  that average is $3,321.69 in royalties per month. Since Defendants owe
7  Passport Health future royalties from February 2011 through August 2017,
8  Defendants owe $259,091.82 in future royalties.

### 4. Mitigation

> The doctrine of mitigation of damages holds that a plaintiff who suffers damage as a result of . . . a breach of contract . . . has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided. A plaintiff may not recover for damages avoidable through ordinary care and reasonable exertion. The duty to mitigate damages does not require an injured party to do what is unreasonable or impracticable.

Valle de Oro Bank v. Gamboa, 26 Cal. App. 4th 1686, 1691 (1994) (citations and internal quotation marks omitted). "The burden of proving that losses could have been avoided by reasonable effort and expense must always be bourne by the party who has broken the contract." Brandon & Tibbs v. George Kevorkian Accountancy Corp., 226 Cal. App. 3d 442, 460 (1990).

Passport Health mitigated its damages by making a reasonable effort to get a replacement franchisee. Therefore, Passport Health's damages are reduced by the $12,000 franchise fee paid by the replacement franchisee, plus the $2,712.94 in royalties paid from December 2010 through March 2011.

Defendants argue that since the replacement franchisee's business is not yet established, its future income is likely to increase

1  over time. However, estimating an increase in gross revenue, and thereby
2  estimating an increase in the royalty payments, is too speculative. Dr.
3  Rajwani's Passport Health franchise in the Sacramento area is not yet
4  established and "the determination of . . . profits of a new business
5  presents problems of proof." Shade Foods, Inc., 78 Cal. App. 4th at 890.
6  Defendants offer no evidence regarding how much the replacement
7  Sacramento area franchise's future royalties might increase or how this
8  should be calculated. Therefore, an estimate of the future royalties of
9  the replacement Sacramento area franchise is based on the average
10 monthly royalties the replacement franchisee has paid thus far, which is
11 $678.24. Therefore, the future royalties from the replacement franchisee
12 from April 2011 through August 2017 totals $51,546.24.

### 5. Total Damages for These Claims

Travel Med and Flaherty, as guarantor, owe $346,057.74 for the breach of the Franchise Agreement and the Guarantee. These damages are reduced by $66,259.18 in mitigation. Therefore, Defendants are ordered to pay Passport Health $279,798.56 for the breach of the Franchise Agreement and breach of the Guarantee claims.

### B. TRADEMARK INFRINGEMENT

Passport Health argues that under 15 U.S.C. § 1117(a) it is entitled to recover Travel Med's profits for the period Travel Med infringed on Passport Health's trademark by using the "www.passporthealthnca.com" website; Passport Health also argues the award of profits should be tripled since Travel Med wilfully infringed on Passport Health's trademark.

Under § 1117(a), "plaintiff shall be entitled, . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15

U.S.C. § 1117(a). "The equitable limitation upon the granting of monetary awards would seem to make it clear that such a remedy should not be granted as a matter of right." Lindy Pen Co., Inc. v. Bic Pen Corp., 982 F.2d 1400, 1404-05 (9th Cir. 1993) (quoting Maier Brewing Co. v. Fleischmann Distilling Corp., 390 F.2d 117, 120 (9th Cir. 1968)). Further, "[i]f the court shall find that the amount of the recovery based on profits is . . . excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum . . . shall constitute compensation and not a penalty." 15 U.S.C. § 1117(a).

"Because proof of actual damage is often difficult, a court may award damages based on defendant's profits on the theory of unjust enrichment." Lindy Pen Co., Inc., 982 F.2d at 1407 (citation omitted).

> The plaintiff has only the burden of establishing the defendant's gross profits from the infringing activity with reasonable certainty. Once the plaintiff demonstrates gross profits, they are presumed to be the result of the infringing activity. The defendant thereafter bears the burden of showing which, if any, of its total sales are not attributable to the infringing activity, and, additionally, any permissible deductions for overhead.

Id. at 1408 (internal citation omitted).

Passport Health produced evidence of Travel Med's gross sales for the entire infringing period. However, Flaharty's testimony demonstrated that during the time period when the "www.passporthealthnca.com" website displayed the hyperlinks, from August 2010 through February 2011, a de minimis number of individuals were redirected to Travel Med's website from the "www.passporthealthnca.com" website. For this period, Travel Med has shown that there were no profits from the infringing activity. Travel Med failed to produce

evidence of its costs and overhead, which would be deducted from the gross sales to determine Travel Med's profits. However, since Travel Med is required to pay seven percent of its gross revenues in royalties to Passport Health for these months, this amount is deducted from Travel Med's gross sales to determine Travel Med's profits during these months.

Passport Health is awarded Travel Med's profits for the months of April, May, and June 2009, the period during which Travel Med continued use of the "www.passporthealthnca.com" website after the Franchise Agreement was terminated. Travel Med's gross sales for these three months were $168,935.68, seven percent of that is $11,825.50; therefore, Travel Med's profits for this period were $157,110.18. Requiring Travel Med to pay Passport Health for the period from July 2009 through July 2010, when the "www.passporthealthnca.com" website automatically redirected visitors to the "www.travelmedinc.com" website, would be excessive and would constitute a punishment, rather than compensation. The Court finds that a monetary award of $157,110.18, plus the permanent injunction which was previously ordered, fully compensates Passport Health for Travel Med's trademark infringement.

Plaintiff may be awarded treble damages if the defendant's conduct is willful. 15 U.S.C. § 1117(b). "Willful infringement carries a connotation of deliberate intent to deceive. Courts generally apply forceful labels such as 'deliberate,' 'false,' 'misleading,' or 'fraudulent' to conduct that meets this standard." Lindy Pen Co., Inc., 982 F.2d at 1406 (citations omitted). The evidence demonstrates Travel Med's conduct was not intentional or willful since Flaharty was attempting to disassociate Travel Med from Passport Health. Further, when Passport Health notified Travel Med that the automatic redirect was problematic and infringing, Travel Med stopped the automatic redirect.

12

While the attempts to disassociate Travel Med and Passport Health were not complete until February 2011, Flaharty's actions with respect to the domain name were not deliberate, false, or misleading. Therefore, an award of treble damages is not appropriate.

### III. CONCLUSIONS OF LAW

1. Travel Med and Flaharty owe Passport Health $7,535.03 in royalties for April and May 2009.

2. Travel Med and Flaharty owe Passport Health $79,430.89 in royalties for the months of June 2009 through January 2011.

3. Travel Med and Flaharty owe Passport Health $259,091.82 in future royalties for the months of February 2011 through August 2017.

4. Passport Health mitigated its damages by making a reasonable effort to get a replacement franchisee.

5. Through March 2011, the replacement franchise has paid Passport Health $14,712.94 and this mitigation reduces Passport Health's damages.

6. Passport Health's damages are reduced by $51,546.24, the estimated future royalties Passport Health will collect from the replacement franchisee.

7. Therefore, taking into account the mitigation, Travel Med and Flaharty are jointly and severally required to pay Passport Health $279,798.56 in damages for breach of the Franchise Agreement and for breach of the Guarantee.

8. Travel Med's profits for April, May, and June 2009 are $157,110.18.

9. A monetary award of $157,110.18, plus the permanent injunction that was previously ordered, fully compensates Passport Health for Travel Med's trademark infringement; requiring Travel Med to

pay a larger monetary award would be excessive and would be punishment, rather than compensation.

10. Travel Med's conduct was not willful and treble damages are not awarded.

11. Therefore, Passport Health is awarded $157,110.18 from Travel Med for the Trademark Infringement claim.

12. Accordingly, judgment shall be entered in favor of Plaintiff Passport Health, Inc.

Dated:  September 6, 2011

_____
GARLAND E. BURRELL, JR.
United States District Judge